In re PALMDALE HILLS PROPER-TY, LLC, and its Related Debtors, Jointly Administered Debtors.

Palmdale Hills Property, LLC; Acton Estates, LLC; SunCal Communities I, LLC; SunCal Emerald Meadows, LLC; Steven M. Speier, Chapter 11 Trustee; SunCal Beaumont, LLC; SunCal Johansson Ranch, LLC; Seven Brothers, LLC; Kirby Estates, LLC; SunCal Communities III, LLC; SunCal Summit Valley, LLC; SunCal Bickford Ranch, LLC, Appellants/Cross–Appellees,

v.

Lehman Commerical Paper, Inc.; Lehman Ali, Inc.; Northlake Holdings, LLC; OVC Holdings, LLC, Appellees/Cross–Appellants.

BAP Nos. CC–10–1007–KiMkH, CC–10–1008–KiMkH.
Bankruptcy No. SA 08–17206 ES.

United States Bankruptcy Appellate Panel for the Ninth Circuit.

Argued and Submitted Sept. 23, 2010.

Decided Aug. 10, 2011.

Sean O'Keefe, Winthrop Couchot Professional Corp., Newport Beach, CA, for Palmdale Hills Property, LLC, et al.

Louis R. Miller, Miller Barondess, LLP, Los Angeles, CA, for Steven M. Speier, Ch. 7 Trustee.

Christopher R.J. Pace, Pachulski Stang Ziehl & Jones LLP, Los Angeles, CA, Lehman Commercial Paper, Inc., et al.

Before: KIRSCHER, MARKELL, and HOLLOWELL, Bankruptcy Judges.

## OPINION

KIRSCHER, Bankruptcy Judge.

This appeal gives us an opportunity to expound on our decision in *Jonas v. Farmer Bros. Co. (In re Comark)*, 145 B.R. 47, 49 (9th Cir. BAP 1992), to conclude that master repurchase agreements, or "repos," which provide language that "the parties intend that all transactions hereunder be sales and purchases and not loans," and which include annexes that do not alter the effect of these terms, are true sales and not secured transactions.

Appellants[1] (collectively "SunCal") appeal an order from the bankruptcy court determining that Appellees/Cross-Appellants Lehman Commercial Paper, Inc. ("LCPI"), Lehman ALI, Inc. ("Lehman ALI"), Northlake Holdings LLC ("Northlake"), and OVC Holdings LLC ("OVC") (collectively the "Lehman Entities" or "Lehman") could file certain proofs of claim as the authorized agent of lender Fenway Capital LLC ("Fenway") under Fed. R. Bankr.P. 3001(b).[2] The Lehman Entities cross appeal an order from the bankruptcy court determining that certain mortgage securities transferred by LCPI to Fenway were true sales and not secured loans. We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Relevant Facts.

SunCal was formed to develop real estate projects throughout California as part of a joint venture that began in the late 1990's between SCC Acquisitions, Inc. and the Lehman Entities. From 2005 to 2007, LCPI and/or Lehman ALI made a series of loans to SunCal ("SunCal Loans") pursuant to "Loan Agreements" totaling approximately $2 billion.

SunCal defaulted on the loans. The many SunCal debtors filed voluntary chapter 11 petitions on November 6 and November 17, 2008; involuntary petitions were filed against the remaining SunCal debtors in November 2008. The bankruptcy court entered orders for relief for the involuntary debtors in January 2009. The chapter 11 estates of all of the SunCal debtors are being jointly administered pur-

---

1. Appellants are jointly administered debtors that consist of 26 affiliates of SCC Acquisitions, Inc.

2. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

suant to an order entered on March 11, 2009.

In the meantime, on November 18, 2008, the Lehman Entities submitted a letter (the "November 18, 2008 Letter") to Fenway, c/o Hudson Castle Group, Inc., and JPMorgan Chase Bank, N.A. ("JPMorgan" individually, collectively "Fenway/JPMorgan"), informing them that certain borrowers, guarantors and pledgors of the SunCal Loans had filed bankruptcy and that involuntary filings had been filed by creditors against other borrowers and guarantors under the SunCal Loans. The November 18, 2008 Letter further informed Fenway/JPMorgan that SunCal had filed for relief from the automatic stay in the Lehman bankruptcy case in the Southern District of New York, 08–13555. It concludes: "The purpose of this letter is to give you notice of the filings affecting the [SunCal] Debtors and to let you know that we will keep you advised as we proceed on behalf of the lenders under the SunCal Loans in these cases and any other cases that may be filed." Attached to the November 18, 2008 Letter are Exhibits A and B that respectively identify the SunCal Loans and the SunCal debtors.

The Master Repurchase Agreement ("MRA"),[3] dated August 22, 2008, was the beginning of a complex transaction involving multiple parties not necessarily visible in this contested matter. In summary, LCPI sold the SunCal Loans to Fenway through a MRA. Fenway then pledged the SunCal Loans as collateral to Fenway Funding for a Series 2008–2 Note. Fenway Funding then provided the proceeds from the Series 2008–2 Note as collateral to Lehman Brothers Holdings, Inc. ("LBHI") for some commercial promissory notes. LBHI used its interest in the commercial promissory notes as collateral for a loan issued by JPMorgan. Deutsche Bank Trust Company Americas serves as the commercial promissory note collateral agent and administrator.

After the November 18, 2008 Letter from the Lehman Entities to Fenway/JPMorgan, Deutsche Bank issued a Notice, dated November 19, 2008, to JPMorgan and Fenway Funding, of a commercial promissory note default. Additional correspondence was issued from JPMorgan to Fenway and Deutsche Bank in February 2009 demanding that Fenway and Deutsche Bank take all necessary steps to collect proceeds from any SunCal foreclosures under the MRA and commercial promissory notes, given its knowledge that Lehman was pursuing motions in the SunCal bankruptcies in California. Counsel for JPMorgan sent a similar letter in February 2009 to Irena Goldstein ("Goldstein"), a bankruptcy attorney and counsel for Fenway, requesting information as to what steps were being taken to protect Fenway's obligations in the transaction. Deutsche Bank in February 2009 sent a letter to JPMorgan stating that it was not taking any action as collateral agent or administrator, but noted that Lehman had, in the November 18, 2008 Letter, detailed actions it would take on the SunCal Loans, of which a copy was provided to Fenway.

**3.** Repurchase agreements or "repos" are used by parties for short-term cash needs. A standard repo consists of a two-part transaction. First, the seller transfers specified securities to the buyer in exchange for cash. Second, the seller contemporaneously agrees to "repurchase" the same or equivalent securities at the original price, plus an agreed upon additional amount, on a specified future date.

*Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S & L Ass'n (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 878 F.2d 742, 743 (3d Cir.1989). *See Comark*, 145 B.R. at 49 ("In a typical repo, simultaneous with the sale of a security, the seller agrees to buy back the security at a designated future date . . . for the original purchase price plus interest . . . .").

Throughout SunCal's bankruptcy, the Lehman Entities had represented that they were creditors under the terms of the Loan Agreements. SunCal had no reason to question this representation until Danske Bank appeared before the bankruptcy court on March 25, 2009, and represented that it owned one of the SunCal Loans pursuant to a repo with Lehman. Danske Bank's disclosure prompted SunCal's counsel to send a letter to Lehman's counsel inquiring whether any of the other SunCal Loans were sold to third parties by way of repos or otherwise. Before Lehman's counsel responded, on March 27, 2009, the Lehman Entities filed proofs of claim for the remaining eleven SunCal Loans. In each proof of claim form the Lehman Entities represented themselves as "creditor," but also attached riders stating that they were the "agent for the lenders." Lehman did not disclose the identity of the lenders or submit any documentation supporting their contention that they were the authorized agent for the lenders.

On April 15, 2009, counsel for the Lehman Entities responded to SunCal's inquiry and disclosed that several of the SunCal Loans had been sold by LCPI to Fenway (among others) via repos prior to SunCal's bankruptcy and that some parties may claim interests in the repo loans. Notably, Lehman's counsel did not respond to SunCal's letter until after SunCal had propounded a third-party subpoena on JPMorgan, who SunCal believed was the transferee of the some of the SunCal Loans.

SunCal learned on April 28, 2009, through documents produced by JPMorgan, that on August 22, 2008, Fenway as "Buyer" and LCPI as "Seller," entered into the MRA that transferred seven SunCal Loans to Fenway.

Thirteen proofs of claim (the "Disputed Claims") relating to the seven SunCal Loans sold to Fenway (the "Sold Loans"), which total approximately $1.6 billion, are the subject of this appeal. Below is a chart reflecting each of the Sold Loans, which Lehman entity filed the related Disputed Claim, and which Lehman entity was the original agent in the underlying Loan Agreement:

| Sold Loan | Disputed Claim Filed By | Original Agent on Loan Agreement |
|---|---|---|
| SunCal Communities I Loan ("SunCal I Loan") | LCPI | LCPI |
| Ritter Ranch Loan ("Ritter Loan") | LCPI | LCPI |
| PSV Loan | Lehman ALI | Lehman ALI |
| Delta Coves Loan | Lehman ALI | Lehman ALI |
| Marblehead/Heartland Loan ("Marblehead Loan") | Lehman ALI | Lehman ALI |
| Oak Valley Loan | OVC | Lehman ALI |
| Northlake Loan | Northlake | Lehman ALI |

According to the terms of the MRA:

All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging

or hypothecating the Purchased Securities....

The MRA also states that *"the parties intend that all Transactions hereunder be sales and purchases and not loans"* (emphasis added).[4] Finally, Annex III to the MRA, which is entitled "Hold–in–Custody Transaction Annex" (the "HIC Annex"), appoints LCPI as the custodial agent for the Purchased Securities and states that LCPI "shall maintain the Purchased Securities ... in a segregated account to the order of Buyer." The HIC Annex further states:

> Agent shall not take any action ... in respect of the Purchased Securities ... except (i) to the extent otherwise provided in the Agreement in connection with Seller's right of substitution....

As for the Loan Agreements related to the Sold Loans, the PSV Loan, Delta Coves Loan, Marblehead Loan, Oak Valley Loan, and Northlake Loan identify the "Lenders" as "Lehman ALI and such other Lenders who may ... become Lenders hereunder pursuant to this Agreement." These five loans identify the "Agent" as "Lehman ALI and its successors and assigns." Sections 8.2.4 and 9.1 of these loans grant agency rights to Lehman ALI:

> 8.2.4 *Enforcement of Rights.* Agent (subject to any consent of Lenders) may enforce any and all rights and remedies under the Loan Documents ... and may pursue all rights and remedies available at law or equity.
>
> 9.1 *Appointment: Nature of Relationship.* Agent is hereby appointed by each of the Lenders as its contractual representative hereunder ... and each

of the Lenders irrevocably authorizes Agent to act as the contractual representative of such Lender with the rights and duties expressly set forth herein and in the other Loan Documents.

Section 10.2 of these five loans binds any successors and assigns to the terms and provisions of the Loan Agreements.

The Ritter Loan and the SunCal I Loan contain similar agency provisions but identify LCPI as the "Syndication Agent" and "Administrative Agent." Section 9.1 of the Ritter Loan and Section 8.1 of the SunCal I Loan grant irrevocable agency rights to LCPI, and allow LCPI:

> [T]o take such action on [the Lender's] behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incident thereto.

Sections 10.6 and 9.6, respectively, bind any successors and assigns to the terms and provisions of the Loan Agreements.

**B. Procedural History of the Disputed Claims.**

On May 29, 2009, SunCal filed an objection seeking to strike the Disputed Claims ("Motion to Strike") on the basis that they were improperly filed and invalid because the Lehman Entities were neither "creditors" nor a "creditor's authorized agent" as required by Rule 3001(b). Specifically, SunCal contended that because LCPI had sold all of its rights, title, and interests in the Sold Loans to Fenway via

---

4. The MRA is an industry standard form published in 1996 by the Bond Market Association ("BMA"), which is now known as SIFMA. The "Guidance Notes" to the 1996 version of the MRA (used here), state:

> As in the past, the [MRA] will continue to provide, on a reciprocal basis, the basic legal protections that are essential for repo market participants, including (i) explicit characterization of transactions as *purchases and sales* .... (Emphasis added).

the MRA, Fenway was the "creditor," not LCPI. Alternatively, SunCal contended that under the terms of the MRA, LCPI's agency right was limited to only the "hold-in-custody agent" for the Sold Loans. Moreover, SunCal continued, the Lehman Entities failed to show by way of any documentation that they had express authority to file the Disputed Claims as Fenway's "authorized agent" prior to filing them. Further, because Lehman ALI, Northlake, and OVC were not parties to the MRA, and because Fenway produced no evidence that it authorized any of them to act as its agent, those entities had no rights whatsoever.

In response, the Lehman Entities argued that: (1) they were permitted to file the Disputed Claims as owners of the Sold Loans because the MRA constituted a transfer for security rather than a true sale; and (2) they could file the Disputed Claims as "authorized agents" of Fenway pursuant to the Loan Agreements. Specifically, the Lehman Entities contended that LCPI's agency rights in the HIC Annex—which were granted for the limited purpose of perfecting security interests under the UCC—created a different type of agency than under the Loan Agreements, and the HIC Annex did not limit, alter, or terminate LCPI's agency rights created by the Loan Agreements as SunCal contended. As a result, the Lehman Entities's agency obligations under the Loan Agreements continued to be in effect.

To rebut SunCal's evidence, Lehman offered the Loan Agreements, the MRA, a declaration from secured transactions expert Professor Jeanne Schroeder ("Schroe-

der"),[5] and a declaration from Goldstein. With respect to whether the MRA constituted a sale or transfer for security, Goldstein declared:

> [W]hile it is correct that Fenway purchased interests in the loans pursuant to the [MRA], it is not true that the Lehman Entities relinquished all right, title and interest in the loans.
>
> [T]he loans serve as the ultimate collateral for the CP Notes issued by [Fenway] to LBHI.
>
> While [Fenway] may have legal title to interests in the loans in question, LBHI [not a party to this dispute] has the beneficial interest.... Simply put, Fenway has no skin in the game.

As for the Lehman Entities's agency authority, Goldstein stated:

> [F]enway purchased loans governed by loan agreements under which a Lehman entity serves as agent. Fenway has not terminated such entity's role as agent and fully supports Lehman's efforts in the Debtors' cases in connection with the loans.

The bankruptcy court held a hearing on SunCal's Motion to Strike on June 30, 2009. It expressed concern that the Lehman Entities had failed to disclose in the Disputed Claims that the repo occurred, suggesting that they were perhaps being "purposely vague" to avoid a determination that the MRA constituted a sale, as the document clearly stated. The Lehman Entities responded that they believed they owned the Sold Loans since the MRA constituted a transfer for security, and an evidentiary hearing would allow them to

---

**5.** SunCal objected to Schroeder's declaration on the grounds that it was inadmissable legal opinion; she "opin[ed] on an ultimate issue of law." (Aplt. Reply Br. at 7). At the June 30 hearing on the Motion to Strike, the bankruptcy court stated that it "found [Schroeder's] declaration interesting, but not particularly persuasive for purposes of the hearing...." As a result, the court felt no need to rule on SunCal's objection.

prove it.[6] SunCal rejected this, contending that no ambiguity existed in the MRA; the parties clearly stated their intention that the MRA be treated as a sale. The Lehman Entities admitted that they filed the Disputed Claims as both "creditor" and "agent of the creditor" as a protective measure in case they were wrong and did not own the Sold Loans. As the bankruptcy court put it, the Lehman Entities "hedged their bets."

About half-way through the hearing, the bankruptcy court announced its ruling on the "sale versus loan" issue. In applying New York contract law, the bankruptcy court found that the MRA was unambiguous on its face; the parties intended it to be treated as a sale. Hence, no reason existed to consider any extrinsic evidence:

> And given what I consider to be the unambiguous statement of the parties with respect to the repo agreements I can make a finding that there was a sale. And that's what it will be deemed, a sale, and not a transfer for security.

The hearing proceeded, focusing on the remaining issue of whether the Lehman Entities could file the Disputed Claims as authorized agent for Fenway. The bankruptcy court observed that the Lehman Entities would have to show they had express authorization to file the Disputed Claim for Fenway, and that the authority existed as of the filing date of March 27, 2009. It determined that Goldstein's declaration did not establish the requisite authority. While Goldstein stated that Fenway considered the Lehman Entities to be its agent and that Fenway never terminated the agency relationship, she did not establish that Fenway expressly granted, prior to March 27, 2009, Lehman authority to file the Disputed Claims. The bankruptcy court also noted that considering the amount of money at stake—$1.6 billion—it seemed odd that Fenway did not have counsel appearing to say that "as of March 27th, we absolutely authorized Lehman to act for us." After extensive argument on the agency issue, the court decided that an evidentiary hearing was required on the matter. The continued agency hearing was set for November 5, 2009.

On October 2, 2009, the bankruptcy court entered an order (the "Sale Order") and its findings and conclusions consistent with its June 30 oral ruling. The court concluded that the MRA's language was clear as to the objective intent of the parties: they intended the transfer of the Sold

---

6. While Lehman posits that the MRA constituted a "transfer for security," Lehman prevailed on a "sale" argument involving a similar MRA before Judge Sontchi on May 23, 2008, in *Am. Home Mortg. Inv. Corp. v. Lehman Bros. Inc. (In re Am. Mortg. Holdings, Inc.)*, 388 B.R. 69, 91 (Bankr.D.Del.2008) ("*American Home*"). Neither party cited this case in their briefs.

The Panel raised this issue at oral argument. Afterwards, SunCal filed a letter pursuant to FRAP 28(j) providing the Panel with citations to additional cases determining repos as sales and not loans and cases discussing agency issues. SunCal, in its letter, raised an argument that Goldstein did not have authority to authorize another person to file proofs of claim. Lehman, in a supplemental response, pointed out that SunCal's argument concerning Goldstein's authority was not argued in the briefs before the bankruptcy court or this Panel and therefore had been waived. We agree that this argument was waived on appeal. *See e.g., Pokorny v. Quixtar*, 601 F.3d 987, 994 (9th Cir.2010) (rejecting argument first raised at oral argument and in FRAP 28(j) letter).

Lehman also included in its response a supplemental notice of additional citations and filed a supplemental transcript from a New York hearing. Lehman then filed a third supplemental filing referencing a decision from the Bankruptcy Appellate Panel for the Eighth Circuit, dated January 14, 2011. The Panel will consider such supplemental filings as it deems appropriate.

Loans to be a true sale. Accordingly, the Lehman Entities could not file the proofs of claim as "creditors" and doing so was a misrepresentation.

The parties conducted discovery and filed supplemental briefing prior to the November 5 agency hearing. Goldstein filed a second declaration on July 9, 2009; SunCal deposed her on July 17. In her second declaration, Goldstein stated that the Loan Agreements expressly authorized the Lehman Entities to pursue Fenway's rights and remedies available at law or in equity against the borrower, and to act for Fenway in all matters in connection with litigation, foreclosure, or other similar actions. Goldstein also stated that the November 18, 2008 Letter from Lehman to Fenway/JPMorgan, apprised Fenway of SunCal's bankruptcy and "confirmed [Lehman's] authority to act as agent for Fenway in connection with those proceedings." Specifically, according to Goldstein, the November 18, 2008 Letter confirmed that "Lehman was continuing to act as authorized agent under the SunCal Loan Agreements in connection with those proceedings and was actively pursuing all avenues of recovery." Goldstein further declared that conversations with Lehman representatives subsequent to the November 18, 2008 Letter, but prior to Lehman's filing of the Disputed Claims, led her to understand that "Lehman, as Fenway's authorized agent, would take whatever action it deemed necessary or appropriate to protect Fenway's interests in the [Sold Loans]," which included "fil[ing] proofs of claim." Finally, Goldstein stated that at all times relevant to the SunCal bankruptcy, the Lehman Entities were expressly authorized to act as agents on behalf of Fenway's interests under the Loan Agreements.

SunCal disputed Goldstein's testimony. First, SunCal contended that Fenway could not have intended to be bound by the Loan Agreements' agency provisions because Fenway admittedly never saw the Loan Agreements until June 2009, which was months after the Disputed Claims were filed, and because it never signed any document agreeing to be bound by them. SunCal also rejected the November 18, 2008 Letter as evidence of express authority by Fenway because it said nothing about Lehman acting "as agent for Fenway," a point which Goldstein admitted at deposition. As for the "conversations" between Goldstein and Lehman's counsel, which occurred in February 2009, that "confirmed" their agency, Goldstein admitted at deposition that the word "agent" never came up but only that Lehman's counsel was "actively pursuing" Fenway's interests in the Sold Loans. Further, SunCal argued that Goldstein's subjective understanding that Lehman, as Fenway's authorized agent, would take whatever action necessary to protect Fenway's interests, including filing proofs of claim (which Fenway never saw nor signed), was insufficient for an "express" agency. Finally, SunCal pointed out that even on June 17, 2009, the day before her deposition and months after the Disputed Claims were filed, Goldstein admitted in an email to Lehman's counsel that she did not even know "who" Fenway's supposed agents were: "With respect to my declaration—is Lehman ALI the agent for all of the loans or is LCPI also an agent?"

The bankruptcy court orally ruled in favor of the Lehman Entities on the agency issue on November 5, 2009. Generally, no material facts were in dispute. The court noted that it carefully reviewed the exhibits, documents, Goldstein's deposition testimony, various declarations, cases cited by the parties, the bankruptcy rules, and New York agency law. First, it determined that the documentary authority for the Lehman Entities to act on behalf of

"Lenders," which included Fenway by virtue of the MRA, was found in the Loan Agreements. The language in the Loan Agreements was sufficiently specific and broad enough to include filing proofs of claim. The court, however, acknowledged Goldstein's admission that Fenway did not review the Loan Agreements until June 2009. Thus, the Loan Agreements were not sufficient to satisfy the requirement of an express authority, as to Fenway, at the time the Disputed Claims were filed because intent to continue the agency may have been lacking. No other written evidence existed except for the November 18, 2008 Letter, but the court agreed that it did not reference "agency" explicitly; it merely apprised Fenway of SunCal's bankruptcy and that the Lehman Entities intended to proceed under the Loan Agreements. Therefore, the court concluded that any express authority by Fenway would have been oral. The court read into the record Goldstein's unrefuted testimony about her February 2009 conversations with Lehman's counsel:

(Court reading GOLDSTEIN'S testimony): You are taking care of this, aren't you? You are pursuing this matter. They would advise me yes, we are actively pursuing this matter.

COURT: She also testified:

(Court reading GOLDSTEIN'S testimony): I confirmed during my conversations in February with [Lehman's counsel] that Lehman was taking all actions necessary to recover on the loans.

COURT: And goes on to say that it was her understanding that they were agent. She further testified they, meaning Lehman, told me:

(Court reading GOLDSTEIN'S testimony): They were actively involved in pursuing actions on behalf of the lenders in the SunCal cases.

COURT: I consider this part of the record to be important because in order to find authority on behalf of Lehman to act for [Fenway] the authority would have had to be [sic] have been given prior to the filing of the proofs of claims.

. . . .

So I really focused quite a bit on this part of the record to determine whether or not there was sufficient evidence there to establish that there was expressed authority.

After considering all of the evidence relating to acts and conversations that took place prior to March 27, 2009, the bankruptcy court held that sufficient evidence existed to establish that at the time the Disputed Claims were filed, Fenway had expressly authorized the Lehman Entities to act on its behalf. The court also noted:

I think that it is possible for a principle to provide authority or to give express authority without actually saying the words ["]and you may file a proof of claim on my behalf.["] I think it was sufficient that Ms. Goldstein testified that she expected Lehman to pursue recovery on behalf of Fenway in the SunCal bankruptcy and certainly pursuing and attempting to recover would necessarily include the filing of proofs of claims.

On December 21, 2009, the bankruptcy court entered an order (the "Agency Order") in accordance with its November 5 oral ruling. On January 28, 2010, it entered the related finding and conclusions. The parties timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(b)(2)(B) and 1334. We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Did the bankruptcy court err when it determined that the MRA constituted a sale and not a secured loan?

2. Did the bankruptcy court err when it determined that Fenway's express authorization for the Lehman Entities to act on its behalf in the SunCal bankruptcies necessarily included authorization for the Lehman Entities to file the Disputed Claims as Fenway's "authorized agent?"

## IV. STANDARDS OF REVIEW

■ We review factual findings for clear error. *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 32 (9th Cir. BAP 2008). A finding is clearly erroneous if it is illogical, implausible, or without support in the record. *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir.2009) (en banc). If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer*, 470 U.S. 564, 573–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). "A finding that one person is another's agent is generally reviewed as a question of fact, governed by the clearly erroneous standard. . . . The nature and extent of the agent's authority and whether apparent authority existed are also questions of fact." *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1295 (9th Cir.1982).

■ We review de novo the bankruptcy court's conclusions of law and its interpretation of statutes and rules. *Clear Channel*, 391 B.R. at 32. Whether the

MRA constituted a sale or a loan is a mixed question of law and fact where the legal issues predominate, which we review de novo. *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir.2004). Likewise, whether a contract is ambiguous is a matter of law reviewed de novo. *United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1264 (9th Cir.2003) (interpretation of language of a contract is a question of law reviewed on a de novo basis with no deference accorded to the decision of the trial court); *Commercial Paper Holders v. Hine (In re Beverly Hills Bancorp)*, 649 F.2d 1329, 1334 (9th Cir.1981) (same).

## V. DISCUSSION

### A. The Bankruptcy Court Did Not Err When It Determined That The MRA Constituted A Sale.

#### 1. The Lehman Entities's Contentions.[7]

The Lehman Entities contend that in its determination of whether the MRA constituted a sale or a loan, the bankruptcy court failed to consider the "objective intent of the parties" as evidenced by "the terms of the transaction as well as extrinsic evidence of intent, such as the books and records of the parties, accounting practices, regulatory treatment of the transactions and trade custom and usage," quoting *Comark*, 145 B.R. at 53 (citing *Bevill, Bresler & Schulman Asset Mgmt. Corp v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 67 B.R. 557 (D.N.J.1986) (applying New York law and concluding that the

---

7. On March 25, 2010, Lehman moved in its New York bankruptcy case (08–13555) for authority to enter into a compromise that would unwind the Fenway structure and place the SunCal Loans in the possession of LCPI. Dkt. no. 7831. SunCal filed a third party objection to that compromise. After a hearing, the New York bankruptcy court approved the compromise. Pursuant to the New York bankruptcy court's order dated May 13, 2010, LCPI repurchased the "Repo Assets" (i.e., SunCal Loans) pursuant to the MRA and is now the sole owner of the "Repo Assets." Dkt. no. 9030. On August 27, 2010, the United States District Court for the Southern District of New York affirmed.

parties' intent is the controlling consideration when determining whether a repo is a sale or loan) ("*Bevill I*")). Lehman further contends that the bankruptcy court focused on isolated terms of the MRA to incorrectly conclude that it was unambiguous, and thus it erroneously refused to consider evidence outside of the MRA.

## 2. Applicable Law.

■ The MRA and Annexes thereto are the controlling documents at issue. Under New York law, which governs here, the objective intention of the contracting parties controls a court's interpretation of their contract. *American Home*, 388 B.R. at 90–91 (applying New York law). *See Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978) ("It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed.") (citation omitted).

■ A contract must be construed as a whole. Isolated words and phrases are not necessarily determinative of the meaning of the contract. This result follows even if the meaning of the particular isolated words and phrases is not subject to differing interpretations. *Bevill I*, 67 B.R. at 586. "Where the intention of the parties is clearly and unambiguously set forth in the agreement, effect must be given to the parties' intent as revealed in the language used without regard to extrinsic evidence." *Id.*

■ "[I]f a contract is clear, a court will not look beyond the four corners of the document for evidence of meaning." *American Home*, 388 B.R. at 90 (citing *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458 (2d Cir.1994)). Courts have applied this rule when interpreting repos. *See Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F.Supp.2d 275, 300 (S.D.N.Y.1998); *American Home*, 388 B.R. at 91; *In re CRIIMI MAE, Inc.*, 251 B.R. 796, 801 (Bankr.D.Md.2000).

Determining whether a repo is a sale or loan is not a novel issue. A Panel addressed it in *Comark* in 1992. Notably, the repos at issue there did not involve a written, explicit statement that the parties intended the transactions to be a purchase and sale and not a loan. *Comark*, 145 B.R. at 53. Therefore, intent was questionably ambiguous and the Panel had to consider the terms of the repo as well as extrinsic evidence. *Id.* Ultimately, the Panel concluded that the transactions were "securities transactions"—i.e., sales. *Id.* at 54.

In a recent case involving LBHI and LCPI, the Delaware bankruptcy court (applying New York Law) examined the terms and operative provisions of the MRA at issue. It considered, and rejected, the provision in the MRA that the Lehman Entities contend negates the parties' intent:

> [I]n the event any such Transactions are deemed to be loans, Seller shall be deemed ... to have granted to Buyer a security interest in all of the Purchased Securities. . . .

*American Home*, 388 B.R. at 91. *See also CRIIMI MAE*, 251 B.R. at 802 (statement that the parties intended the repo to be a sale was not vitiated or made equivocal by the savings provision set forth in the second part of the paragraph should the repo be deemed a loan). This conclusion is also supported by Schroeder, Lehman's own expert witness. *See* Jeanne L. Schroeder, *A Repo Opera: How Criimi Mae Got Repos Backwards*, 76 Am. Bankr.L.J. 565, 594 (2002). Ultimately, the *American Home* court determined that the MRA was "unambiguous" and concluded that the transaction at issue was a sale and not a loan because: (1) the parties stated their

unambiguous intent "that all Transactions hereunder be sales and purchases and not loans;" (2) the MRA denominated the parties "Buyer" and "Seller," rather than "lender" and "borrower;" and (3) the MRA contained such terminology as "Purchase Date," "Purchase Price," "Repurchase Date," and "Repurchase Price." 388 B.R. at 91.

In analyzing the repo agreements at issue in *Bevill I*, the bankruptcy court noted that while they contained isolated terms like "buyer" and "seller," and stated that the buyer could freely rehypothecate the "purchased securities," it also noted that the repos contained terms generally found in secured loan transactions. 67 B.R. at 587–90. As a result, the repos were ambiguous and thus extrinsic evidence was necessary. *Id.* at 590. After considering books and records, expert testimony, regulatory treatment, and trade custom and usage, the bankruptcy court concluded that "[t]he unequivocal language of purchase and sale in the repo and reverse repo agreements at issue . . . is strong *prima facie* evidence that the parties intended the transactions to be treated accordingly." *Id.* at 597. "[T]he mere presence of secured loan characteristics in repo . . . agreements is not enough to negate the parties' voluntary decision to structure the transactions as purchases and sales." *Id.* at 598. Thus, even after considering extrinsic evidence, the *Bevill I* court still came back to the expressed "sale" language in the repo agreements to ultimately conclude that the parties intended them to be sales. Notably, what distinguishes *Bevill I* from the instant case is that the repo agreements there lacked the explicit statement that "the parties intend that all Transactions hereunder be sales and purchases and not loans." *Bevill I*, which was decided in 1986, prompted the BMA to add the explicit "intent" statement in the MRA in 1987. *See* n. 19 of Brief for BMA

[SIFMA] as Amicus Curiae Supporting Defendant, *CRIIMI MAE, Inc. v. Citicorp Securities, Inc.*, Adv. No. 98–1637 (Bankr. D.Md. Feb. 24, 1999) (attached as appendix A to this Opinion, reprinted from http://www.sifma.net/story.asp?id=1239) ("CRIIMI MAE/Citicorp").

The Southern District of New York also addressed this "sale versus loan" issue in *Granite Partners.* The MRA at issue there was identical to that here. The court spent a considerable amount of time discussing *Bevill I*, but concluded that the MRA before it differed from those in *Bevill I* in one important respect—the agreements at issue affirmatively stated the parties' intent to treat the transactions as a sale—i.e., "the parties intend that all Transactions hereunder be sales and purchases and not loans." 17 F.Supp.2d at 301–02. As a result, the *Granite Partners* court held that the MRA constituted a sale. It also set forth in a footnote the other operative provisions the court believed conformed to this stated intention: "Buyer and Seller," "Purchase Date and Purchase Price," "Purchased Securities," "Repurchase Date" and, most telling, the parties agreed that title to the Purchased Securities passed to the Buyer, who was permitted to engage in repos with the Purchased Securities or otherwise transfer or hypothecate them. *Id.* at 302 n. 13.

The only case somewhat helpful to Lehman is *CRIIMI MAE*. There, the bankruptcy court found the parties' explicit statement of intent persuasive, but reasoned that the contract labels of "sale" and "purchase" did not mandate a finding that the MRA actually conveyed absolute transfer of the securities. 251 B.R. at 802. After carefully considering various portions of the MRA, the bankruptcy court concluded that it was ambiguous for several reasons, including: (1) Seller was entitled to retain income earned on the pur-

portedly sold securities prior to default; (2) Buyer was required to return the identical securities to Seller, not simply equivalent ones; and (3) if the transaction was an absolute sale, there would be no reason to empower the Buyer to engage in repurchase transactions, or sell, transfer, pledge, or hypothecate the securities. *Id.* at 802–805. As a result, the *CRIIMI MAE* court set an evidentiary hearing so it could examine extrinsic evidence. In Schroeder's article noted above, she criticizes the *CRIIMI MAE* court for its analysis concerning whether the MRA provision was ambiguous because it affected the "parties' relative rights in the underlying securities." 76 Am. Bankr.L.J. at 597.

### 3. Analysis.

 Here, the bankruptcy court determined that the MRA was unambiguous on its face; the parties clearly intended the transfer of the Sold Loans to be a sale and not a transfer for security. The court focused on the parties' statement of intent in the MRA: "the parties intend that all Transactions hereunder be sales and purchases and not loans." It also found other operative provisions of the MRA to be of importance: that LCPI held, was authorized to sell, and was selling "[a]ll of [its] interests in the Purchased Securities" to Fenway.

The Lehman Entities argue "strong indicia" exists that the transfer of the Sold Loans under the MRA was a transfer for security and not a sale. First, if LCPI defaulted under the MRA, Fenway's rights were limited to: selling the Sold Loans in a commercially reasonable manner pursuant to § 9–610 of the UCC; to apply all sale proceeds against LCPI's obligations to pay the repurchase price and price differential; and to turn over any surplus to LCPI. Lehman contends that such procedures are more like a security interest as

opposed to a sale. We agree with *Bevill I,* which rejected this same argument and concluded:

> This term in the repo … agreements also does not provide a factual basis for favoring a secured loan characterization over a purchase and sale characterization. Rather, this language merely sets forth the legal consequences of both a breach of a purchase and sale contract whereby the seller is released from his obligation to sell and is correspondingly entitled to dispose of the contracted goods in a commercially reasonable manner upon reasonable notice to the breaching buyer, as well as a default on a loan secured by pledged collateral whereby the secured creditor is similarly entitled to dispose of the collateral upon notice to the defaulting debtor.

67 B.R. at 588 (citations omitted).

Next, the Lehman Entities contend that the MRA was a loan because, unlike a typical repo, Fenway had to transfer back to LCPI identical securities rather than equivalent ones. Schroeder testified that transferring back identical securities was impossible here since mortgage loans are unique, thus the MRA was a transfer for security. Moreover, Lehman contends that because the MRA only permitted LCPI, not Fenway, to substitute securities, this limits the "seeming absolute transfer" associated with a sale, citing *CRIIMI MAE,* 251 B.R. at 804. We disagree with Lehman and agree with the reasoning set forth in *Bevill I,* which rejected these arguments and held that such terms did not convert a repo into a loan. 67 B.R. at 588 ("Even assuming that the agreements require the return of identical securities, it is unclear why the [ ] Committee believes this fact distinguishes … repo transactions as secured loans."). Likewise, we agree with *Granite Partners* which explicitly rejected Schroeder's con-

tention that because the MRA consisted of the "unique" securities of mortgage loans, as opposed to Treasury instruments, then the MRA constituted a transfer for security. 17 F.Supp.2d at 303 (rejecting parties' argument that mortgage securities must be treated differently than Treasury securities; the industry standard MRA that applies generally to all repo transactions does not distinguish between Treasury and other types of securities). Even Schroeder in her article concluded that the standard MRA's do not distinguish between types of securities but would leave any distinguishing terms to the annexes to the MRA. 76 Am. Bankr.L.J. at 599.

The Lehman Entities further assert that despite the MRA using terms like "sale" and "repurchase," the MRA grants rights to LCPI that are inconsistent with a sale. For example, the MRA allows LCPI to collect all principal, interest, and other distributions paid on the Sold Loans "to the full extent it would be so entitled if the Securities had not been sold." If this were a true sale, argues Lehman, Fenway would keep all funds. While the Lehman Entities want to downplay the MRA's explicit terms of "sale" and "purchase," and contend that LCPI's right to collect all principal, interest, and other distributions paid on the Sold Loans is inconsistent with a sale, this operative provision's deliberate use of the word "sold" in the same sentence Lehman says supports a transfer for security undermines their argument.

Finally, the Lehman Entities contend that because the MRA is a "hold-in-custody" ("HIC") repo, Fenway did not take possession of the Sold Loans, which therefore points to a secured transaction rather than a sale. The Panel rejected this same argument in *Comark* and determined that simply because a buyer in HIC repo transactions does not take possession of the securities does not mean that the transac-

tions were not sales. 145 B.R. at 53. Again, Schroeder in her article states:

> The [HIC repo] provision ... is designed to clarify that, even though the seller might retain possession of the certificate evidencing the security sold, the buyer is the owner, and the seller is no longer the owner, of the security. To conclusively demonstrate that such an arrangement is not a sham transaction, the clause specifically provides that *despite the fact that the buyer does not take custody,* nevertheless the repo buyer does obtain *substantive* rights that are inconsistent with the repo seller's ownership and inconsistent with the characterization of the repo as a security interest.

76 Am. Bankr.L.J. at 599.

### 4. Conclusion.

In examining the four corners of the MRA, we construe it to be unambiguous and conclude that the Lehman Entities and Fenway intended the transaction to be a sale. First, the parties explicitly stated that they "intend that all Transactions hereunder be sales and purchases and not loans." The courts in *Granite Partners* and *American Home* found this language highly persuasive in determining the parties' intent. We further agree with *Granite Partners* and *American Home* that many of the MRA's terms and operative provisions conform to the parties' intent that MRA's be treated as sales, such as: "Buyer" and "Seller," "Purchase Date" and "Purchase Price," "Purchased Securities," "Repurchase Date" and "Repurchase Price," and that "[a]ll of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date." Even the court in *Bevill I,* after considering a great deal of extrinsic evidence, considered the MRA's purchase and sale language "unequivocal" despite its other traditional secured transaction language, and concluded

that the MRA was a sale. 67 B.R. at 598. We recognize that words and phrases cannot be read in isolation. *Fireman's Fund Ins. Co. v. Grover (In re Woodson Co.),* 813 F.2d 266, 272 (9th Cir.1987). However, having reviewed the MRA and the Annexes thereto as a whole, we hold that the bankruptcy court did not err when it concluded that these documents unambiguously provided for a sale and not a secured transaction.

Therefore, since we have concluded that the MRA was unambiguous on its face for the reasons stated above, the bankruptcy court was not required to look beyond the four corners of the MRA to determine the parties' intent. *American Home,* 388 B.R. at 90. Accordingly, we see no error here.

 However, even if we considered the MRA ambiguous, and we reviewed the extrinsic evidence in this case, we would still conclude that the MRA was a sale. The Lehman Entities contend that they treat repos as loans in their books and records, which is reflected in their SEC Form 10–Q's. We see no evidence in the record to support this. Even if true, *Comark* reasoned that accounting practices do not transform repos into loans. *Jonas v. Farmer Bros. Co. (In re Comark),* 124 B.R. 806, 815 (Bankr.C.D.Cal.1991) *aff'd* 145 B.R. 47 (9th Cir. BAP 1992).

The Lehman Entities further assert that the Financial Accounting Standards Board's "Statement of Financial Accounting Standards No. 140" also supports their view that repo participants generally treat them as loans, unless a true sale opinion letter is involved, which did not happen

here. While *Comark* may preclude this argument, we have found more relevant authorities that espouse a different view. For example, SIFMA (f/k/a/ the BMA), the publisher of the MRA, states in the "Guidance Notes" to the 1996 version of the MRA (used here) that it will continue to provide "explicit language" that MRA's are to be characterized as "purchases and sales." In addition, SIFMA frequently files amicus briefs in MRA characterization cases to ensure that courts honor the parties' explicit intent to treat them as sales and not secured loans. The following are some rather compelling statements made by SIFMA in its brief filed in *CRIIMI MAE/Citicorp*: [8]

> The operative provisions of the MRA have, in fact, been purposefully drawn by [SIFMA] to remove any doubt about the parties' intent to construe repos as securities contracts. . . .
>
> . . . .
>
> The [SIFMA] MRA reflects the understanding of the repo market as a whole that repurchase agreements for insolvency law purposes are purchases and sales.

Finally, the Lehman Entities contend that Goldstein's testimony established that while Fenway did purchase interests in the Sold Loans pursuant to the MRA, Lehman did not relinquish all right, title, and interest in the Sold Loans. Goldstein did make this statement, however, she also stated in a letter to counsel for SunCal dated May 12, 2009, that "[u]nder the [MRA], LCPI *sold* its interests in certain loans and securities to [Fenway]." [9]

---

**8.** Page 6 of SIFMA's amicus brief filed in the *CRIIMI MAE* adversary proceeding, attached as appendix A to this opinion.

**9.** The parties dispute one other issue regarding the Sold Loans. Lehman asserts that five of the SunCal Loans (PSV, Marblehead, Oak

Valley, Northlake, and Ritter) consisted of two types of loans—"Revolver" loans and "Term" loans. According to Lehman, only the Term loans were transferred by LCPI to Fenway via the MRA, not the Revolver loans, as evidenced by the Repo Confirmations. SunCal contends that its Motion to Strike

## B. The Bankruptcy Court Did Not Err When It Determined That Fenway's Express Authorization For Lehman To Pursue Its Interests In The Sun-Cal Case Necessarily Included An Authorization To File The Disputed Claims.

### 1. SunCal's Contentions.

SunCal contends that under Rule 3001(b) an agent must have "express" authority to file a proof of claim on behalf of a creditor; a general authority for an agent to act on a principal's behalf in a bankruptcy is not sufficient. Therefore, according to SunCal, the bankruptcy court erred when it determined that only a general grant of authority to act on a creditor's behalf in a bankruptcy, rather than an express authority to file a proof of claim, was sufficient to authorize the Lehman Entities to file the Disputed Claims for Fenway. SunCal further contends that no evidence exists, either orally or in writing, that Fenway expressly authorized the Lehman Entities to file the Disputed Claims on its behalf prior to March 27, 2009, yet the bankruptcy court found otherwise.

### 2. Applicable Law.

#### a. Bankruptcy Law.

 Under Rule 3001(b), "a proof of claim shall be executed by the creditor or the creditor's authorized agent...." Additionally, any entity seeking to represent more than one creditor in a chapter 11 case must file a verified statement setting forth the names and addresses of the creditors, the nature and amount of the claims, and the relevant facts and circumstances surrounding the employment of the agent. Rule 2019(a); *In re Elec. Theatre Rests. Corp.*, 57 B.R. 147, 148–49 (Bankr. N.D.Ohio 1986); *In re North Bay Gen. Hosp. Inc.*, 404 B.R. 443, 452 (Bankr. S.D.Tex.2009). "The consequences of a purported agent's failure to comply with Bankruptcy Rule 2019 are largely a matter for the bankruptcy court's discretion." *North Bay*, 404 B.R. at 453 (citing *In re Mandalay Shores Coop. Hous. Ass'n, Inc.*, 63 B.R. 842, 853 (N.D.Ill.1986)). The Lehman Entities concede that they failed to comply with Rule 2019. However, they eventually filed the required disclosures on September 22, 2009, prior to entry of the Agency Order on December 21, 2009, which the bankruptcy court deemed sufficient.

#### b. New York Agency Law.

 "An agency relationship is typically established by 'written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'" *Hyosung Am., Inc. v. Sumagh Textile Co.*, 934 F.Supp. 570, 575 (S.D.N.Y.1996), *rev'd in part on other grounds*, 137 F.3d 75 (2d Cir.1998). "The elements of an agency relationship are: (1) 'a manifestation by the principal that the agent shall act for him,' (2) 'acceptance of the undertaking' by the agent, and (3) 'an understanding be-

---

sought to strike the Disputed Claims in their entirety, without carving out any Revolver loan components. The Sale Order does not distinguish between Revolver or Term loans in its defined term of "Sold Loans."

On October 8, 2009, Lehman filed a Motion for Clarification asking the bankruptcy court to clarify that its definition of "Sold Loans" did not include the Revolver loans. SunCal opposed, arguing that the Sale Order clearly included the Revolver loans.

SunCal asserts on appeal, and Lehman confirms, that the bankruptcy court has not yet ruled on Lehman's Motion for Clarification, and thus it is not properly before us on appeal. In reviewing the record, we agree, and therefore we do not reach any decision on this issue.

tween the parties that the principal is to be in control of the undertaking.' " *Id. See also Meese v. Miller*, 79 A.D.2d 237, 241, 436 N.Y.S.2d 496, 499 (N.Y.App.Div.1981); *Kyung Sup Ahn v. Rooney, Pace, Inc.*, 624 F.Supp. 368, 370 (S.D.N.Y.1985); *S.E.C. v. Am. Bd. Of Trade, Inc.*, 654 F.Supp. 361, 366 (S.D.N.Y.1987) (citing to Restatement (Second) of Agency § 1 cmt. b (1977)); *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F.Supp.2d 155, 161 (S.D.N.Y.2007) (citing to Restatement (Third) of Agency § 1.01 cmt. d (2006)).

Section 1.01 of the Restatement (Third) of Agency is consistent with § 1 of the Restatement (Second) of Agency except § 1.01 introduces "assent" and replaces "consent." *See* Restatement (Third) of Agency § 1.01 (2006) ("Restatement") ("Agency is the fiduciary relationship that arises when one person ... manifests assent to another person ... that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). Comment. d of § 1.01 clarifies that the use of "assent" is to "emphasize that unexpressed reservations or limitations harbored by the principal do not restrict the principal's expression of consent to the agent."

▇▇▇ The Lehman Entities in the November 18, 2008 Letter informed Fenway that "we will keep you advised as we proceed on behalf of the lenders under the SunCal Loans...." "A person manifests assent or intention through written or spoken words or other conduct." Restatement § 1.03. "As between the agent and the principal, an unexplained failure to object may also in appropriate circumstances constitute a manifestation of assent or intention." *Id.* at cmt. e. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably be-

lieves, in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act." Restatement § 2.01.

▇▇▇ "As commonly used, the term 'express authority' often means actual authority that a principal has stated in very specific or detailed language." *Id.* at cmt. b. If the principal's manifestation indicates that the agent act, the agent may take the necessary steps to accomplish the principal's objective. Restatement § 2.02 cmt. d. "A principal's manifestation of assent to an agency relationship may be informal, implicit, and nonspecific." Restatement § 1.01 cmt. d. The agent must consider the language or conduct of the principal. *Id.* at cmt. f. Agency may be created at least by estoppel or by ratification (prior to a temporal limit, i.e., a claims bar date). *See* Restatement §§ 2.05, 4.01, 4.03 and 4.05.

### c. Case Law Cited By Lehman.

While no Ninth Circuit authority exists on the specific issue raised by Lehman, some courts have held that only when an agent has express authorization may he file a proof of claim on behalf of another. *Sheftelman v. Standard Metals Corp. (In re Standard Metals Corp.)*, 817 F.2d 625, 631 (10th Cir.1987), *vacated on other grounds*, 839 F.2d 1383 (10th Cir.1987); *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 852 (Bankr.S.D.N.Y.1989) ("Only when an agent has express authorization may he file a claim on behalf of another."); *North Bay*, 404 B.R. at 459 (same); *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 89 B.R. 358, 376 (Bankr.S.D.N.Y. 1988) (each individual claimant must file a proof of claim or expressly authorize an agent to do so on its behalf).

### 3. Analysis.

▇▇ The bankruptcy court agreed with SunCal that if any authority existed for

the Lehman Entities to file the Disputed Claims such authority had to have existed prior to their filing them on March 27, 2009. *Standard Metals Corp.*, 817 F.2d at 631 (Rule 3001(b) does not allow an agent to decide to file a proof of claim and then inform the creditor after the fact). The bankruptcy court further acknowledged that any written express authority for the Lehman Entities to file the Disputed Claims could have come only from the Loan Agreements, not the MRA. While the court believed that the agency provisions in the Loan Agreements were sufficiently specific and broad enough to include filing proofs of claim, it concluded that because Fenway did not read the Loan Agreements until months after the Disputed Claims had been filed any intent to continue the agency relationship was in question. Therefore, express authority for Lehman to file the Disputed Claims, if any, had to have been oral.

Goldstein admitted that the word "agency" or "proof of claim" never came up in her February 2009 conversations with Lehman's counsel. However, she did testify that those conversations confirmed that Lehman was pursuing Fenway's interests in the SunCal bankruptcy case, and that Lehman was taking all actions necessary to recover on the Sold Loans, which she, as a bankruptcy attorney, understood to include filing proofs of claim.

Based on Goldstein's unrefuted testimony, the bankruptcy court found that Fenway had expressly authorized the Lehman Entities to act on its behalf, which necessarily included authorization to file the Disputed Claims. The court reasoned that it was possible for Fenway to give express authority to file the Disputed Claims without actually saying the words: "and you may file a proof a claim."

Rule 3001(b) provides that an authorized agent may file a proof of claim. The Rule does not specify that the agent must be expressly authorized to file a claim, which under the Restatement would require "very specific or detailed language." *See* Restatement § 2.01. cmt. b. Common-law agency and the Restatement allow agency to be manifested by conduct, silence, estoppel or ratification.

The November 18, 2008 Letter from Lehman to Fenway specifically stated that Lehman would act on the lenders' or assigns' behalf, connoting an agency relationship. *See* Restatement § 1.01 cmt. g. Fenway did nothing to refute, qualify or terminate Lehman's agency actions on the lenders' behalf. In fact, Fenway, through Goldstein by means of an email dated May 12, 2009, to SunCal's attorney, affirmed that Fenway did not object to Lehman's enforcement of the lenders' rights under the Sold Loans. We note that this subsequent ratification did occur after the claims' bar date, which may limit its temporal effectiveness. However, certainly Fenway never instructed the Lehman Entities not to act on the lenders' behalf in the SunCal bankruptcy. Through Fenway's oral discussions between Goldstein and Lehman's counsel in February 2009, and through the numerous November 2008 letters that were exchanged between Deutsche Bank, JPMorgan, Fenway and Goldstein, and through Fenway's (or any other lenders') failure to qualify, condition or refute Lehman's agency activities on behalf of the lenders, Fenway manifested by its conduct that the Lehman Entities should act on its behalf. Therefore, the Lehman Entities were authorized to act for the lenders and, in this instance, as explained below, to file proofs of claim as the lenders' authorized agents.

The Lehman Entities had the burden of proving an agency relationship existed. *North Bay*, 404 B.R. at 461. Even though the Panel does not conclude, as we discuss

below, that "express" authorization is required under Rule 3001(b) in this Circuit, we agree with the bankruptcy court that express authority, based on the facts in this case, existed to allow Lehman to file the Disputed Claims, as established through the parties' conduct, oral representations, and the November 18, 2008 Letter. Goldstein's unrefuted testimony about her February 2009 conversations established, at minimum, an express authorization for the Lehman Entities to act on Fenway's behalf in SunCal's bankruptcy case.

▮ Accordingly, the question is, under Rule 3001(b) does a principal's authorization to its agent to pursue the principal's interests in a debtor's bankruptcy necessarily include authorization for the agent to file a proof of claim on the principal's behalf, or must the principal expressly authorize the agent "to file a proof of claim?" The requirements of Rule 3001(b) is a question of law we review de novo.

Virtually all of the cases SunCal relies upon have one common denominator—the purported authorized agent failed to prove that even a general principal-agent relationship existed, much less any authority to file a proof of claim. As a result, the courts in those cases concluded that no express authorization existed for the purported agent to file a proof of claim.

In *Ionosphere Clubs,* the consumers union ("CU") filed a motion to compel debtor, Eastern Airlines and its affiliate club, Ionosphere, to adopt a travel refund procedure. 101 B.R. at 846. CU asserted that it filed the motion on behalf of all 100,000–plus ticketholders who would be compensated through the program. *Id.* at 851–52. However, contrary to CU's assertions, its compliance under Rule 2019 was in question. CU had filed specific authorization from just eight individuals, which only accounted for $6,000 and three of the refund

claims, yet CU contemplated that the refunds could exceed $20 million. The bankruptcy court found that CU's evidence of authorization by the ticketholders did not meet Rule 2019's requirements in that (1) not all ticketholder claimants had given their express authorization to CU; and (2) even where authorization was given, only three individuals had specified the amount of their claims. The court then went on to state: "If CU purports to act as agent on behalf of ticketholders, it needs to show that this general agency relationship is consensual in nature." *Id.* at 852. Based on the lack of evidence, the bankruptcy court concluded that CU failed to show it had the power to act on behalf of the eight ticketholders, much less over 100,000 of them. *Id.* at 853.

The same is true for *North Bay*—the case upon which SunCal rests its argument. The unsecured creditors agent ("UCA") filed a proof of claim in debtor's second bankruptcy case on behalf of unsecured creditors from debtor's prior case. The UCA asserted that his authority to file the proof of claim on behalf of the unsecured creditors in the second case stemmed from the plan in debtor's prior bankruptcy. 404 B.R. at 452. The plan language allowed the UCA to "pursue and enforce the rights of the Class 6 Creditors under the Plan under the Bankruptcy Code and other applicable laws." *Id.* at 459. The bankruptcy court found this language, which is similar to that in the Loan Agreements, too general to constitute "express authorization" that the UCA could file proofs of claim on their behalf in the *second* case. *Id.* at 459–60. No other evidence, written or oral, existed that any of the old unsecured creditors had authorized the UCA to file proofs of claim on their behalf in the second case. Therefore, with only an old plan from debtor's prior case before it as evidence of the UCA's

agency, the court could not conclude that this constituted an express agency relationship in the second case, much less that the plan provided authorization for the UCA to file any proofs of claim on behalf of the old unsecured creditors. *Id.* at 461.

In *Standard Metals*, the issue before the Tenth Circuit was whether Rule 3001 allows class proofs of claim. 817 F.2d at 631. The Tenth Circuit concluded that it does not. The Ninth Circuit has subsequently held that it does. *See Birting Fisheries, Inc. v. Lane (In re Birting Fisheries, Inc.)*, 92 F.3d 939 (9th Cir.1996). In any event, the Tenth Circuit rejected the class representative's contention that his representative status of the bond purchasers in another civil proceeding provided authorization for him to represent the bond purchasers in the proof of claim. *Standard Metals*, 817 F.2d at 631. Again, an actual principal-agent relationship was lacking. Likewise, *Manville Forest* involved class claims and whether the purported agent could file the proof of claim and subsequently inform the creditor of the fact. *Manville Forest* is simply not on point.

### 4. Conclusion.

In considering SunCal's arguments and the cases and Restatement discussed above, we conclude that Rule 3001(b) does not require a principal to expressly authorize its agent "to file a proof of claim" on its behalf. Rather, a principal's authorization for the agent to act on its behalf in a debtor's bankruptcy case necessarily in-

cludes authorization to file a proof of claim; the principal need not expressly state to the agent: "you may file a proof of claim."

We agree that the bankruptcy court did not clearly err when it found that Goldstein's February 2009 conversations with Lehman's counsel established an actual principal-agent relationship between the Lehman Entities and Fenway. Such a conclusion is further supported by the November 18, 2008 Letter and the numerous conversations and February correspondence between the parties involved in the MRA and related transactions. Unlike *Ionosphere*, *North Bay*, and *Standard Metals*, a manifestation from Fenway existed that the Lehman Entities were to act on its behalf in the SunCal case, and the Lehman Entities accepted the undertaking. *Hyosung*, 934 F.Supp. at 575. Therefore, we see no legal or factual error here by the bankruptcy court.

The express authorization requirement SunCal asks us to impose on creditors is burdensome and impractical. Such a standard of express authorization would require all creditors, including those unfamiliar with bankruptcy matters, to tell their agents: "and you may file a proof of claim on my behalf." Under SunCal's theory, creditors who failed to utter the "magic" words would be unduly prejudiced. Such a result defies common sense.[10]

### VI. CONCLUSION

Based on the foregoing reasons, we AFFIRM the Sale Order and AFFIRM the Agency Order.

---

**10.** We also reject SunCal's alternative argument in support of reversing the Agency Order that at a February 11, 2010 hearing on an unrelated motion to dismiss the Lehman Entities disavowed any agency authority given by Fenway to act on its behalf. The Lehman Entities deny SunCal's contention.

This hearing at which the alleged disavowment took place was *after* the Agency Order had been entered on December 21, 2009. In

reviewing the docket, this issue was never raised before the bankruptcy court via a Fed. R.Civ.P. 60(b) motion, or some other form of relief. Therefore, SunCal raises this issue for the first time on appeal. As such, we will not consider it, particularly since this issue is a question of fact better reserved for the fact finder. *Franchise Tax Bd. v. Roberts (In re Roberts)*, 175 B.R. 339, 345 (9th Cir. BAP 1994).

**Appendix A**

* SIFMA Events
* Contact SIFMA

[ Search ]

# SIFMA
Securities Industry and
Financial Markets Association

published: 2.24.99

Divisions
Regions
Interest Areas

* Archived
 Information

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MARYLAND

Southern Division

360 Madison
Ave.
New York, NY
10017-7111
Tel 646.637.9200
Alt 212.808.1000
Fax 646.637.9126

In re )
)
) Chapter 11
CRIIMI MAE INC., et al. ) Case No. 98-2-3115 DK
Debtor(s). )Jointly Administered
CRIIMI MAE INC., ) )
Plaintiff, )Adversary No. 98-1637-DK
v. )
CITICORP SECURITIES, INC. )
Defendant. )

1399 New York
Ave., NW
Washington, DC
20005-4711
Tel 202.434.8400
Fax 202.434.8456

MEMORANDUM OF LAW OF
THE BOND MARKET ASSOCIATION AS *AMICUS CURIAE*

Ralph N. Albright, Jr.
MORGAN, LEWIS & BOCKIUS LLP
1800 M Street, N.W.
Washinton, D.C. 20036
(202) 467-7185

St. Michael's
House
1 George Yard
London, EC3V
9DH
Tel
44.20.77.43.93.00
Fax
44.20.77.43.93.01

Catherine A. Ludden
Robert C. Mendelson
David Stuelting
101 Park Avenue
New York, New York 10178
(212) 309-6000

Attorneys for the Bond Market Association

*Of Counsel:*

George P. Miller
Patricia F. Brigantic
Scott C. Runkin
THE BOND MARKET ASSOCIATION

40 Broad Street, 12th Floor
New York, New York 10004
(212) 440-9400

February 24, 1999

| | |
|---|---|
| In re | ) |
| | ) |
| | ) Chapter 11 |
| CRIIMI MAE INC., et al. | ) Case No. 98-2-3115 DK |
| Debtor(s). | )Jointly Administered |
| CRIIMI MAE INC., | ) |
| Plaintiff, | )Adversary No. 98-1637-DK |
| | ) |
| v. | ) |
| CITICORP SECURITIES, INC. | ) |
| Defendant. | ) |

MEMORANDUM OF POINTS AND AUTHORITIES OF

## THE BOND MARKET ASSOCIATION AS *AMICUS CURIAE*

The Bond Market Association (the "Association") submits this memorandum as amicus curiae for the purpose of bringing to the Court's attention its views regarding the legal status of the Association's Master Repurchase Agreement ("MRA") and, in particular, the MRA's contractual liquidation rights that are expressly preserved and protected in the bankruptcy context by § 555 of the Bankruptcy Code (11 U.S.C. § 555).

Issues relating to the MRA's contractual liquidation rights and § 555 are now before the Court as a result of the motion for partial summary judgment of defendant Citicorp Securities, Inc. ("CSI") dated February 8, 1999. This motion seeks a determination that transactions entered into between CSI and plaintiff Criimi Mae*1* pursuant to the MRA are "securities contracts" within the meaning of § 555.

The Association believes that repurchase transactions in securities documented with the Association's form of MRA are securities contracts and afford to stockbrokers, financial institutions, and securities clearing agencies the rights of liquidation protected by § 555. The Association further believes that the primary argument of Criimi Mae and the Unsecured Creditors -- that the MRA is not a "securities contract" and therefore § 555 is not applicable -- is unsound as a matter of law and policy.*2* If accepted, this argument would have a negative impact on the repo markets and securities markets generally, and specifically on the MRA, Association's widely used standard form of repurchase agreement.

## INTEREST OF THE *AMICUS CURIAE*

The Association represents approximately 200 securities firms and banks that underwrite, distribute, and trade fixed-income securities in the United States as well as in international markets. Its members transact business in a wide variety of public and private debt securities and in repurchase agreements. All of the primary dealers in U.S. Treasury obligations, as recognized by the Federal Reserve Bank of New York, are members of the Association, as are other securities dealers.*3* From its inception in 1976,*4* the Association has addressed significant issues confronting the securities industry, has sought to foster sound credit, business, and trading practices for participants in the bond markets, and has undertaken initiatives to improve market efficiency. In all of its work, the Association provides a market

perspective on fixed-income securities legislation, regulation, and market practices.

The Association's interest in the instant case is particularly strong in that the repurchase transactions at issue between Criimi Mae and CSI were documented on an industry standard form originated and published by the Association known as the Master Repurchase Agreement.5 The Association, therefore, can provide insight into the purposes and assumptions underlying the MRA, which is widely used nationally and internationally by members of the Association as well as by non-members. The development of the MRA by the Association is part of its efforts to assist in the development of recommended standards for the repo market by promoting the adoption of uniform repo trading practices and by providing standard forms of legal documentation for repo transactions. Those practices and forms -- including the MRA -- are transactionally neutral since the Association's members, and many other market participants, are both repo buyers and sellers. As a result, the Association has a keen interest in ensuring the preservation of one of the MRA's basic legal protections considered essential by repo market participants: the express liquidation rights afforded to a non-defaulting party in the event of a counterparty bankruptcy.

The Association also is especially active in addressing important legal and regulatory issues affecting repurchase agreements (also called "repos") and reverse repurchase agreements (also called "reverse repos"). The Association has participated actively in legislative consideration of issues affecting the repo market. For example, Association representatives testified at the Congressional hearings concerning § 559 of the Bankruptcy Code, which provides that repo transactions involving government or agency securities are not subject to the Code's automatic stay provisions.6

As part of its work, the Association has filed briefs in cases of significant interest to participants in the debt capital markets. In 1998, for example, the District Court for the Southern District of New York accepted the Association's amicus curiae brief in a key decision involving whether repurchase agreements pursuant to the MRA are secured loans or purchases and sales. See Granite Partners L.P. v. Bear, Stearns & Co., Inc., 17 F.Supp. 2d 275, 208 (S.D.N.Y. 1998) (holding that transactions pursuant to MRA are purchases and sales). A variety of other amicus briefs have been filed by the Association in insolvency cases involving repos.7

The Association's independent interest in the instant litigation stems from its strong concern for maintaining the liquidity, depth, and efficient operation of debt capital markets in this country and abroad. The repo market depends for its continued effective functioning on the ability of market participants to rely on counterparty commitments that have predictable and certain legal consequences. A decision that could be interpreted as holding that repurchase transactions documented under the MRA, as a matter of law, are not securities contracts would contradict clear statutory law providing that the contractual rights of parties to securities contracts must be protected, and would present transactional uncertainties that could be disruptive and destabilizing for the capital markets.

## SUMMARY OF ARGUMENT

Congressional intent underlying a series of statutory provisions adopted to protect contractual liquidation rights in the bankruptcy context from the exercise of the automatic stay -- including such rights found in repurchase agreements -- is clear and unambiguous. In applying these statutes, courts have effected Congress' intent by consistently construing repurchase agreements as within the scope of these statutory provisions. In reliance on the foregoing, the trillion-dollar repo market has developed exponentially secure in the knowledge that, notwithstanding the automatic stay, contractual commitments that confer liquidation rights to a non-defaulting party will be respected.8

The legal arguments of Criimi Mae and the Official Committee of Unsecured Creditors in this litigation invite the Court to rupture this consensus and interject confusion and uncertainty into the repo market. These arguments, if accepted, would significantly weaken essential legal protections and should be rejected for the following reasons.

First, both CSI and Criimi Mae are sophisticated parties that, by executing the MRA, expressly agreed: (1) that the transactions documented under the MRA are "securities contracts;" (2) that under the MRA either party retains the contractual right to liquidate securities delivered to it in the event of bankruptcy; and (3) that such right "is a contractual right to liquidate . . . as described in Section[] 555[.]" MRA, ¶¶ 11, 19. Controlling precedent requires that the unambiguous intent of the parties to this contract be respected. Furthermore, repo market participants clearly consider repurchase agreements to be purchases and sales and therefore "securities contracts."

Second, the passage of § 555 clearly evinces Congress' commitment to preserve contractual liquidation rights of the sort agreed to by CSI and Criimi Mae, notwithstanding the automatic stay provision of the Bankruptcy Code. Indeed, § 555 represents just one piece of a broad legislative framework developed by Congress over the past two decades designed to exempt parties to certain types of financial agreements from the operation of the automatic stay in the event of bankruptcy. Congress' policy justification in every instance -- including § 555 -- is that these exemptions from the automatic stay are necessary to guard against the broader ripple effect and systemic risk that may be triggered by the insolvency of a single counterparty. Section 559 of the Bankruptcy Code, enacted two years after § 555, merely expands these protections to a broader class of market participants, further evidencing the importance of the repo markets in the view of Congress.

Third, every judicial opinion to have decided the issue -- save one -- has construed repurchase agreements in the bankruptcy context to be the purchase and sale of securities. The sole exception, the notorious Lombard-Wall decision of 1982, provoked an emergency session of Congress to clarify the law and preserve order in the marketplace.9 Since then, no court has held that a repurchase agreement in the bankruptcy context is not a purchase and sale. Indeed, the uniformity of judicial opinion has contributed to the settled position of the fixed-income markets that § 555 means what it says: "[t]he exercise of a contractual right . . . shall not be stayed, avoided or otherwise limited[.]" 11 U.S.C. § 555 (emphasis added).

## ARGUMENT

### OVERVIEW OF REPURCHASE AGREEMENTS

A repurchase agreement, by its terms, involves two separate but related transactions: (1) a sale by a party (the "repo seller") of securities in exchange for cash; and (2) an agreement by the repo seller to repurchase the same or equivalent securities for a specified price at a future date. In a reverse repurchase agreement, the party initially buys the securities in exchange for cash, and incurs a forward obligation to resell them. Every repo is also a reverse repo; that is, a reverse repurchase agreement is simply a repurchase agreement viewed from the perspective of the repo buyer.10

Repos are unique creatures of the capital markets. The free transferability of securities that are the subject of repurchase agreements renders these transactions attractive to securities dealers whose inventories of securities turn over rapidly and who may require securities to be available for a variety of settlement obligations. At the same time, the flexible term of repo agreements makes them an ideal financial management tool for institutional investors investing cash balances. Thus, for "such entities as state and local governments, public and private pension funds, money market and other mutual funds, banks, thrift institutions, and

large corporations, repos have become a vital tool of cash management."[11]

Repos are the principal method used by securities dealers to fund their acquisition of U.S. Treasury securities.[12] The Treasury relies heavily on primary dealers to absorb new government debt issues, and repos are extensively used by dealers to obtain the cash necessary to permit their underwriting of such issues.[13] By maximizing the ease and flexibility with which dealers can acquire and hold inventories of Treasury securities, repo transactions contribute significantly to the depth and liquidity of the secondary market for Treasury securities.[14] Together with other trading techniques and transactions, repos and reverse repos "have benefited the market and the taxpayer by increasing liquidity, thereby lowering the government's financing costs." 1992 Joint Report, supra note 11, at 1.

Repos involving U.S. Treasury securities are also used by the Federal Reserve System as its primary tool for implementation of monetary policy.[15] Federal Reserve Bank of New York repurchase transactions "are, by statute, structured and conducted as contracts for purchase-and-sale." Sternlight Affidavit, supra note 14, ¶ 5. For the purposes of these contracts, the Federal Reserve Bank of New York relies upon the liquidity characteristics of repos made possible by the fact that they are not collateralized loans. See 1994 Fed. Res. Bank Amicus Br., supra note 13, at 4-5.

Repo transactions also perform a similar function with respect to other fixed-income securities, including both exempt and non-exempt securities. They are a vital and cost-efficient mechanism for broker-dealers to fund their inventory and dealing activities in these securities. Rapid movements of securities through repos and reverse repos facilitate this process and are thus among a number of financial mechanisms that contribute to the smooth functioning of the nation's fixed-income markets.[16]

The existence of repo markets in particular types of securities also adds to the liquidity of the underlying cash market for the securities. For example, collateralized mortgage obligations, or CMOs, are securities where cash flows from a securitized mortgage pool are repackaged into classes of interests with different projected maturities and principal repayment schedules which appeal to a broad range of investors with specific investment needs and objectives. CMOs allow their investors to pursue yield, credit, diversification, and other characteristics of residential and commercial mortgage debt instruments while reducing many of their perceived burdens, particularly those relating to prepayment uncertainty and illiquidity of individual mortgage obligations. The ultimate beneficiaries of CMOs and other mortgage backed securities are residential home buyers and other mortgagors who are able to obtain lower-cost mortgages as a result of the cheaper cost of funds to originators. As Congress has recognized, the CMO market, including the repo market for CMOs which enables CMO dealers to fund their inventory and make markets in these securities, is important to the national economy.[17] See generally Granite Partners, 17 F.Supp.2d at 298-99 (description of repos and the repo market "based primarily on the BMA's amicus curiae brief").

The common thread in the repo market is the Association's MRA. Thus, the vast majority of repo market participants -- whether the underlying securities are government securities or non-agency CMOs -- utilize the MRA. See Granite Partners, 17 F.Supp.2d at 303 (noting MRA is the "industry standard . . . and does not distinguish between Treasuries and other types of securities"). As a result, any decision throwing doubt on the legal interpretation of the MRA could have profound consequences across all markets.

TRANSACTIONS DOCUMENTED WITH
THE MRA ARE SECURITIES CONTRACTS

In spite of the automatic stay provision of the Bankruptcy Code, § 555 expressly permits the

"exercise of a contractual right" by a "stockbroker" to liquidate a "securities contract" following a counterparty's bankruptcy. In this case, Criimi Mae argues that its repurchase agreements with CSI pursuant to the MRA were not "securities contracts." Therefore, concludes Criimi Mae, the automatic stay prohibits liquidation of the securities held by CSI pursuant to the repurchase agreements. Criimi Mae's legal arguments -- based primarily on the contention that repurchase agreements are secured loans, not purchases and sales[18] -- are inconsistent with the expectation of the parties, the repo market, the clear intent of Congress, and the relevant case law.

### 1. The Parties to the MRA Already Have Agreed that the Transactions are "Securities Contracts"

Under the MRA, the standard industry documentation for repo transactions prepared by the Association and used by CSI and Criimi Mae, the parties explicitly agree that they "intend that all Transactions hereunder be sales and purchases and not loans[.]" MRA ¶ 6. The operative provisions of the MRA have, in fact, been purposefully drawn by the Association to remove any doubt about the parties' intent to construe repos as securities contracts for the purposes of § 555. Thus[19] the parties are denominated "Buyer" and "Seller," and they agree that on the "Purchase Date" the "Purchased Securities" will be transferred to the "Buyer" or its agent against payment of the "Purchase Price." Id. On the "Repurchase Date," this process occurs in reverse. Id. The parties further acknowledge the difference between their repo transactions and conventional secured indebtedness by agreeing that each "Transaction" is a "repurchase agreement" and a "securities contract" entitled to the benefits of special protective provisions under the Bankruptcy Code. Id. ¶ 19.

Perhaps most telling, the parties agree that title to the Purchased Securities passes to the Buyer, who is explicitly permitted to engage in repos with the Purchased Securities or otherwise transfer or hypothecate them. Id. ¶ 8. Under prevailing market practice, the Buyer, as owner, may sell the Purchased Securities. Such contractual provisions are totally inconsistent with the characterization of a repo as a secured loan.

The decision by market participants to enter into a repo transaction documented with the MRA, structured as a purchase and sale, thus carries with it a variety of explicit legal and regulatory consequences. Market participants who prefer to enter into secured lending transactions rather than repos may do so (with the attendant legal result that their transaction will be treated as a loan); participants who prefer to enter into a sale and wholly distinct forward purchase (with attendant legal consequences) may also do so. The determination of market participants that elect to enter into a repo transaction has been and should be respected and their settled expectations should not be overturned.[20]

The Association's MRA reflects the understanding of the repo market as a whole that repurchase agreements for insolvency law purposes are purchases and sales.[21] Their purchase-and-sale form reflects a value-for-value exchange designed as such for use explicitly in those markets. Market participants use the repo structure because the consequences of employing that structure are well-settled, enabling counterparties to transact among themselves with minimal legal uncertainty.

Recent judicial decisions, without exception, have enforced the contractual expectations of repo parties and the marketplace as to the economic realities of repos. When the repo market began to expand significantly in the early 1980's, however, the legal status of repo agreements was not obvious because repos are unique hybrid transactions that, although structured as purchases and sales, also have some characteristics of other transactional forms, including financings. A repo, though, is distinct from a loan in at least one critical respect. Unlike a lender taking collateral for a secured loan, for example, a repo buyer "take[s] title to

the securities received and can trade, sell or pledge them." SEC v. Drysdale Securities Corp., 785 F.2d 38, 41 (2d Cir. 1986), cert. denied, 476 U.S. 1171 (1986) (finding fact that repo buyer takes title to be "a most significant difference between repos and standard collateralized loans").

Over the past two decades, the understanding of repos as purchases and sales in the insolvency context has become a bedrock principle.22 Diminishing this principle can only have negative consequences.23 As the Federal Reserve warned in its Orange County amicus brief:

> The repo market is supported in significant part by entities with charter or regulatory restriction that prevent them from making secured loans. . . . A sweeping characterization of repos as secured loans in a highly publicized judicial decision could, therefore, jeopardize continued participation of these investors in the repo market. This would deprive the market of much of its depth, and, therefore, much of its liquidity.

1998 Fed. Res. Bank Amicus Br., supra note 14, at 7.

Controlling precedent requires that the Court look no further than the four corners of the document because the intent of the parties is clear.24 No reason exists to disregard the contractual determination by the parties to structure each repo as a purchase and sale: therefore, the express, unambiguous intent of parties to the MRA must be respected.25 See also Granite Partners, 17 F. Supp.2d at 275 (in interpreting MRA, "[t]he key to the inquiry as to whether repos in this case should be characterized as purchase and sale agreements or secured loans lies in the intention of the parties.").

### A. Congress Intended For Transactions Documented Pursuant To Repurchase Agreements Such As The MRA to be Considered Securities Contracts

If accepted, the arguments advanced by Criimi Mae and the Unsecured Creditors would undermine a network of laws enacted by Congress over the past two decades to achieve a single, overarching goal: ensuring stability and avoiding systemic risk to the financial markets by exempting certain transactions from the Bankruptcy Code's automatic stay provision. Section 555, which protects the contractual rights of non-defaulting parties to liquidate securities contracts, represents one of the pillars of these Congressional efforts to protect the market from the ripple effects and systemic risk that may occur when a counterparty to certain financial transactions becomes insolvent.26

These initial statutory protections originated in the Bankruptcy Code Amendments of 1982. In 1984 and 1990, similar provisions designed to realize the same market-protection goals also became law. These provisions -- §§ 555, 556, 559 and 560 -- protect the exercise of contractual rights to liquidate "securities contracts," "commodity contracts," "forward contracts," "repurchase agreements," and "swap agreements" from stay, avoidance, or other limitation in the bankruptcy context.

The House Report to § 555 cogently expressed the necessity of exemption from the automatic stay: "The prompt liquidation of an insolvent's position is generally desirable to minimize the potentially massive losses and chain reaction of insolvencies that could occur if the market were to move sharply in the wrong direction."27 The critical factor for present purposes is that the legislative framework of §§ 555, 556, 559 and 560 must be interpreted plainly lest the Congressional intent of avoiding systemic disruption be defeated. Congress hammered home this point by using the same language in §§ 555, 556, 559 and 560: "the contractual rights of the parties . . . shall not be stayed, avoided or otherwise limited[.]" This

singular Congressional purpose -- so vital to the effective functioning of our capital markets -- belies the argument advanced by Criimi Mae that lengthy discovery is required in order to discern, among other issues, the nature of the collateral, the intent of CSI, and the liquidity of the market. By focusing on these irrelevant factors, Criimi Mae hopes to escape from the essential characterization of the repo transactions it entered into as "securities contracts" that are explicitly entitled to protection under § 555.

Criimi Mae and CSI both made unambiguous contractual commitments. By insisting on lengthy discovery, Criimi Mae seeks to "stay[], avoid[], or otherwise limit[]" CSI's attempt to exercise its contractual rights in contravention of Congress' mandate that the exercise of these rights "shall not" be limited. 11 U.S.C. § 555 (emphasis added). The argument that these rights can be interpreted only in the context of irrelevant factual issues flouts the clear language of § 555.

Underlying Criimi Mae's arguments is the suggestion that § 555 was not intended to encompass repurchase agreements. From the beginning, however, Congress intended § 555 to cover repurchase agreements. Section 555 mentions only one broadly defined category of financial instruments -- "securities contracts.28" Clearly, in 1982 Congress was aware of a variety of specific instruments, including repurchase agreements. Instead of providing a laundry list of various instruments, Congress chose to define one extremely broad category. This is entirely consistent with the Congressional intent of providing a broad remedy that would protect against systemic risk, as opposed to a narrow, cramped loophole.

The fact that § 555 applies to repurchase agreements is further apparent from the legislative history of § 559, which relates to one kind of repurchase agreement: those involving government securities. Congress passed § 559 in an emergency session because Lombard-Wall, supra note 9, created doubts that "[§ 555] did not adequately cover the market for repurchase agreements."29 From the passage of § 555 in 1982 until the Lombard-Wall decision in September 1983, the industry assumed that repurchase agreements were protected under § 555. This point was made by Robert C. Brown, the Chairman of the Board of Directors of the Association, during the House hearings on § 559: "The court decision in the Lombard-Wall case was directly contrary to the long-established custom and usage of the Government securities industry. . . . If [a bankruptcy] had transpired before the Lombard-Wall case the fund manager holding the securities believed he could simply sell them in satisfaction of his contractual claim. Now, however, the Lombard-Wall proceedings have raised considerable uncertainty about whether the pension fund can legally liquidate the repo transaction in that manner." 1984 House Hearings, supra note 9, at 78, 79.

Moreover, the question of whether the term "securities contract" as used in § 555 encompasses repurchase agreements not involving government securities was raised by Congressman Rodino during the hearings on § 559. The written response, dated May 14, 1984, from a National Bankruptcy Conference representative, negates the arguments now being made by Criimi Mae: "I believe the definition of 'securities contract' in Code § 741(7) would appear to be broad enough to cover a repurchase agreement involving non-government securities, since a repurchase agreement is on its face a contract for the purchase and sale of a security, notwithstanding its possible characterization as a loan as a matter of federal bankruptcy law."30

Finally, if any doubt remains, the Senate Report to § 559 provides that:

> [Section 559 was] not intended, however, to affect the status of repos involving securities . . . as securities contracts . . . and their consequent eligibility for similar treatment under other provisions of the Code, such as the provisions giving protection to stockbrokers . . . In particular, a repurchase agreement as

defined in the amendments, insofar as it applies to a security, would continue to be a securities contract as defined in the Code and thus would be subject to the Code provisions pertaining to securities contracts.

1983 Sen. Rep., supra note 11, at 49. Cf. Wyle v. Howard Weil, Labouisse, Freidrichs Inc., 114 F.3d 991 (9th Cir. 1997) (holding that transfer avoidance provision in Bankruptcy Code relating specifically to repurchase agreements that was enacted subsequent to a similar yet broader provision relating to securities contracts was intended to "augment, not to supersede" the previously enacted protection).

Section 559, then, simply extends protection of contractual liquidation rights to all "repo participants" in the context of repurchase agreements involving government securities. Section 555 is limited to protecting the contractual rights of "stockbrokers" and other specified entities to liquidate "securities contracts," including repurchase agreements. Sections 555 and 559 are not mutually exclusive. Assuming CSI is a "stockbroker" as defined in § 101(54), it has the right to liquidate its repo transaction governed by the MRA, a "securities contract" within the meaning of § 555.

### B. Relevant Judicial Decisions Compel a Finding that Repurchase Transactions Documented With the MRA are Securities Contracts

The courts are unanimous that for insolvency and commercial law purposes repos are to be treated as purchases and sales.31 The sole case to find otherwise -- the infamous Lombard-Wall decision, supra note 9 -- provoked a firestorm of criticism32 and prompted a concerned Congress to enact § 559.

The correct precedent in the present context is Granite Partners, which employed axiomatic principles of contract law by analyzing the intent of the parties as gleaned from the MRA. The MRA is consciously drafted to ensure that each party unambiguously accepts the characterization of the repo as a purchase and sale regardless of the type of underlying security. Thus, the MRA in Granite Partners -- the same form of document used by CSI and Criimi Mae -- was held to be a purchase and sale and not a secured loan because "[the] intention [of the parties to the MRA] must be honored." 17 F.Supp.2d at 302.

In another leading decision, Bevill, Bresler I, the court concluded that repo transactions should be viewed as purchases and sales for purposes of the commercial law and insolvency issues before it. Bevill, Bresler I, 67 B.R. at 598. See also In re Comark, 145 B.R. 47, 53 (B.A.P. 9th Cir. 1992) (affirming bankruptcy court's holding that repos at issue are not secured loans under pre-§ 559 law).

Similarly, in In re Residential Resources Mortgage Investments Corp., 98 B.R. 2, 23-24 (Bankr. D.Ariz. 1989), the court concluded that repo transactions involving mortgage-backed securities should be viewed as purchases and sales for purposes of the "securities contract" provisions of the Bankruptcy Code where they have been appropriately documented and otherwise been treated as purchases and sales by the parties.

Criimi Mae's characterization of the repos at issue as secured loans seeks a decision that would be wholly at odds not only the contractual commitment of Criimi Mae itself, but also with every judicial decision to address the issue. In essence, Criimi Mae is asking this Court to issue a decision that may re-ignite the same uncertainty that occurred in the aftermath of Lombard-Wall, supra note 9, uncertainty that Congress and the industry have consciously sought to avoid. Fortunately, no justifiable basis exists for Criimi Mae's position in view of the clear weight of judicial and legislative authority, the unambiguous commitments of the parties, and the expectations of the repo market, the financial community, and Congress.

## CONCLUSION

For the foregoing reasons, The Bond Market Association as amicus curiae urges the Court to find that the Association's Master Repurchase Agreement is a securities contract for the purposes of § 555.

Dated: Washington, D.C.
February 24, 1999

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:_____
Ralph N. Albright, Jr.
1800 M Street, N.W.
Washington, D.C. 20036
(202) 467-7185

Catherine A. Ludden
Robert C. Mendelson
David Stoelting
101 Park Avenue
New York, New York 10178
(212) 309-6000

Attorneys for The Bond Market Association

*Of Counsel:*

George P. Miller
Patricia B. Brigantic
Scott C. Rankin
THE BOND MARKET ASSOCIATION
40 Broad Street, 12th Floor
New York, NY 10004
(212) 440-9400

## FOOTNOTES

[1] "Criimi Mae" refers to CRIIMI MAE INC., the plaintiff in the adversary proceeding.

[2] These arguments are made in: (1) Debtors' Memorandum in Opposition to Motion of Citicorp Securities, Inc. for an Expedited Hearing; and (2) Memorandum of the Official Committee of Unsecured Creditors in Opposition to the Motion of Citicorp Securities, Inc. for an Expedited Hearing Under Section 555 of the Bankruptcy Code.

[3] The Association brings to the Court's attention that defendant CSI was a member of the Association until October 8, 1998, when CSI ceased to exist as a result of the merger of its parent, Citicorp, with Travelers Group Inc. Following the merger, CSI became part of Salomon Smith Barney Inc., which is a member of the Association. In addition, Citicorp Real Estate, Inc., also now part of Travelers Group Inc., is a creditor in the bankruptcy proceedings. Further information regarding the Association's members and its activities may

be obtained from its website, www.bondmarkets.com.

[4] Amicus was previously known as the Public Securities Association and PSA The Bond Market Trade Association.

[5] See Granite Partners L.P. v. Bear Stearns & Co., Inc., 17 F.Supp.2d 275, 303 (S.D.N.Y. 1998) (noting "the fact that [the Association's] Agreement is an industry standard master repo agreement that applies to all repo transactions and does not distinguish between Treasuries and other types of securities"); 5 Collier on Bankruptcy, 559.04[1] n.2 (1998) (describing the Association's MRA as the "standard agreement in common usage by the repurchase agreement markets").

[6] See, e.g., Bankruptcy Reform: Hearings before the Subcomm. on Courts of the Senate Comm. on the Judiciary, 98th Cong, 1st Sess. at 307-09, 337-45 (1983) ("1983 Sen. Hearings") (testimony of Thomas W. Strauss, Public Securities Association). See also Senate Committee on the Judiciary, Subcommittee on Administrative Oversight and the Courts, Hearings on the Business Bankruptcy Reform Act of 1998 (S.1914), (May 19, 1998) (Statement of The Bond Market Association).

[7] E.g., Wyle v. Howard, Weil, Labouisse, Freidrichs Inc, 114 F.3d 991 (9th Cir. 1997); Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n., 878 F.2d 742 (3d Cir. 1989) ("Bevill, Bresler II"); County of Orange v. Merrill Lynch & Co., Inc., et al, Case No. SA CV 95-0037-GLT (C.D. Ca. 1998); West Virginia v. Morgan Stanley & Co., Inc., 459 S.E.2d 906 (W. Va. 1995). The Association has also filed an amicus brief in a case of importance to the fixed income markets in this Federal Circuit, Bance Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017 (4th Cir. 1997).

[8] The amount of repurchase and reverse repurchase agreements outstanding by primary dealers in U.S. government securities involving government and agency securities alone as of the week ending January 20, 1999 was $2.431 trillion. See Federal Reserve Bank of New York, Market Reports Division, Financing By Primary U.S. Government Securities Dealers, at Table IV (Feb. 18, 1999).

[9] In the unreported Lombard-Wall case, the bankruptcy judge's bench decision found the repos at issue to be secured transactions, and therefore possibly subject to the automatic stay. In re Lombard-Wall, No. 82-8-11556, bench op. (Bankr. S.D.N.Y. Sept. 16, 1982). The Third Circuit noted the criticism that followed Lombard-Wall in Bevill, Bresler II. See 878 F.2d at 747 (stating concern of Congress, the Association, the Board of Governors of the Federal Reserve and others that "if Lombard-Wall became the law governing repo transactions, the failure of one repo dealer . . . could have a ripple effect throughout the country's financial markets, causing an otherwise isolated financial problem to spread to many other entities"). The repos at issue in Lombard-Wall were not documented according to the Association's standard form MRA; indeed, the parties used a form that was not generally used. See Bankruptcy Law and Repurchase Agreements: Hearings on H.R. 2852 and H.R. 3418 Before the Subcomm. on Monopolies and Commercial Law of the House of Representatives Comm. on the Judiciary, 98th Cong, 2nd Sess. 50, 87 (1984) ("1984 House Hearings") (Testimony of Robert C. Brown, Chairman of the Board of Directors of the Public Securities Association, that "the written agreement used in the Lombard-Wall case was not the standard of the industry. . . . it is not what the industry generally has used as a repurchase agreement"). The repo agreement in Lombard-Wall also was unusual in that -- unlike the MRA -- the repo buyer had no rights to possession or use of repo securities during the term on the repo. 5 Collier on Bankruptcy 555.02[3] n.6 (1998).

[10] See In re Bevill, Bresler & Schulman Asset Mgt. Corp., 67 B.R. 557, 566-67 (D.N.J. 1986)("Bevill, Bresler I").

[11] Omnibus Bankruptcy Improvements Act of 1983, S. Rep. No. 98-65, at 45 (1983) ("1983 Sen. Rep.").

[12] Department of the Treasury, Securities and Exchange Commission and the Board of Governors of the Federal Reserve System, Joint Report on the Government Securities Market at A-11 (Jan. 1992) ("1992 Joint Report").

[13] See, e.g., Government Securities Act Amendments of 1993, H.R. Rep. No. 255, 103d Cong., 1st. Sess. (1993) at 10-11, reprinted in 1993 U.S.C.C.A.N. 2993, 2996-2997 ("1993 House Report").

[14] See 1983 Sen. Rep., supra note 11, at 45-46; 1983 Sen. Hearings, supra note 6, at 306; 1984 House Hearings, supra note 8, at 50; Amicus Curiae Brief of the Federal Reserve Bank of New York at 6-7, Nebraska Dep't. of Revenue v. Loewenstein, 513 U.S. 123 (1994) ("1994 Fed. Res. Bank Amicus Br.") (appended hereto as Exh.A); Amicus Curiae Brief of the Federal Reserve Bank of New York at 4-5, County of Orange and Moorlach v. Merrill Lynch & Co., Inc., et al., Case No. SA CV 95-0037-GLT (C.D. Ca. 1998) ("1998 Fed. Res. Bank Amicus Br.") (appended hereto as Exh. B).

[15] See Bevill, Bresler II, 878 F.2d at 745 ("The repo market is used by the Federal Reserve System to help execute monetary policy, and serves to finance the national debt at the lowest possible cost."); 1983 Sen. Rep., supra note 10, at 46; 1984 House Hearings, supra note 13, at 52-53; Affidavit of Peter D. Sternlight, Executive Vice-President, Federal Reserve Bank of New York, sworn to Apr. 11, 1986, 2-4 (submitted in Bevill, Bresler I, supra note 9 and appended to 1994 Fed. Res. Bank Amicus Br., supra note 13, attached hereto as Exh. A) ("Sternlight Aff.").

[16] See, e.g., Sternlight Aff., supra note 14, 7 ("Repurchase agreements are a major vehicle in the market-making process, providing the means for creating hedges and arbitrages among various issues and thereby increasing liquidity").

[17] This is clear from the legislative history of the Secondary Mortgage Market Enhancement Act in 1984, which provides that its stated purpose is to "encourage th[e] broadening of the market for mortgage-backed securities by encouraging more extensive involvement of the private sector[.]" S. Rep. No 98-293, at 3 (1984), reprinted in 1984 U.S.C.C.A.N. 2809, 2811. More recently, Congress demonstrated its intent to facilitate a broader secondary market for commercial real estate debt, as underscored by the adoption of commercial SMMEA provisions in 1994. See S. Rep. No. 103-169 (1994), reprinted in 1994 U.S.C.C.A.N. 1881.

[18] Criimi Mae also argues that § 555 is inapplicable because CSI is not a "stockbroker." Without addressing the merits of this issue in the context of the specific facts and circumstances involved, the Association notes that the test for determining whether an entity is a "stockbroker" is not onerous. To come within the definition of "stockbroker," CSI need only show that it is a person "with respect to which there is a customer" and that it is in the business of effecting securities transactions. 11 U.S.C. § 101(54). The critical point is that the "stockbroker" definition does not require proof that the debtor, i.e., Criimi Mae, the counterparty to the securities contracts at issue, was CSI's "customer." Rather, CSI need only demonstrate that it "had at least one customer," in other words, that it generally possesses the status of a stockbroker. See In re ESM Government Securities, Inc., 52 B.R. 372, 374

(S.D.Fla. 1985) (broker-dealer that submitted proof of a single "customer" and which effected securities transactions as a broker "falls squarely within the statutory definition of 'stockbroker.' 11 U.S.C. § 101(46)."). This definition is intentionally broad to protect against the ripple effect and systemic risk that could result from the insolvency of a single stockbroker, and the resulting harm to that stockbroker's customers, if the contractual liquidation rights of a stockbroker with respect to a counterparty were subject to the automatic stay.

[19] The Association reformulated the MRA in 1986 to unmistakably reflect the intent of the parties after the Bevill, Breaker decision held that the use of unequivocal language of purchase and sale in the MRA would be "strong prima facie evidence that the parties intended the transaction to be treated accordingly." 67 B.R. at 597.

[20] See 1998 Fed. Res. Bank Amicus Br., supra note 14, at 7.

[21] The Association, jointly with the International Securities Market Association, also publishes a Global Master Repurchase Agreement ("GMRA") for use in the global capital markets. The GMRA also provides for the characterization of repos as purchases and sales.

[22] Repos may be characterized differently outside the insolvency arena. For example, for taxation purposes repurchase agreements are viewed as secured loans as opposed to repurchase agreements. Nebraska Dep't of Revenue v. Loewenstein, 513 U.S. 123 (1994). The Loewenstein decision is expressly limited to the tax context and "says nothing about how repos should be characterized [for bankruptcy purposes]." 513 U.S. at 136.

[23] The characterization of repurchase agreements as purchases and sales also has implications for the SEC's net capital rule, which is designed to ensure that broker-dealers have sufficient liquidity to satisfy customer claims. 17 C.F.R. § 240.15c3-1 (1998). The net capital rule requires that if a party to a repurchase agreement cannot perform due to, for example, bankruptcy, the non-defaulting broker-dealer must treat the repurchase agreement as if it is in default. If the non-defaulting stockbroker is stayed from liquidating the underlying securities, that stockbroker must take a 100% capital charge for the repurchase amounts. Treating market standard repurchase agreements as secured loans subject to the automatic stay, therefore, will directly harm stockbrokers by impairing their required capital.

[24] The MRA is governed by New York law, MRA, 16, which states that extrinsic evidence of the interpretation of a contract may not be considered when the intent of the parties can be discerned from the face of the contract. E.g., Chimart Assocs. v. Paul, 489 N.E.2d 231, 233 (N.Y. 1986).

[25] See Bevill, Breaker I, 67 B.R. at 597 ("The unequivocal language of purchase and sale in the repo and reverse repo agreements at issue in these test cases is strong prima facie evidence that the parties intended the transactions to be treated accordingly.").

[26] Comparable provisions allow market participants to terminate or liquidate repos when their counterparties are insolvent federally insured depository institutions. See 12 U.S.C. § 1821(e) (8)(A), (e)(8)(D).

[27] H. Rep. No. 97-420 (1982), reprinted in 5 Collier on Bankruptcy 555.LH (1998). There has been little, if any, disagreement. For example, in introducing the exemption for swap agreements in 1989, Senator Deconcini remarked that "I am not aware of any opposition to the legislation[.]" 135 Cong. Rec. 2823 (1989).

[28] The considerable breadth of this definition is apparent from the fact that "securities contract" means the purchase and sale of a "security," and "security" is defined expansively to encompass, inter alia, a note, stock, treasury stock, bond, debenture, collateral trust certificate, pre-organization certificate or subscription, transferable share, voting-trust certificate, certificate of deposit, certificate of deposit for a security, investment contract in an oil, gas, or mineral royalty or lease, limited partnership interest, and any "other claim or interest commonly known as a 'security.'" 11 U.S.C. § 101(49).

[29] 1984 House Hearings, supra note 9, at 72 (Statement of Robert A. Portnoy, Deputy Executive Director and General Counsel, Public Securities Association)

[30] 1984 House Hearings, supra note 9, at 114 (Letter dated May 14, 1984 from H. Bruce Bernstein, Member, National Bankruptcy Conference to Hon. Peter W. Rodino, Jr.).

[31] See Granite Partners, 17 F.Supp.2d at 275; Bevill Bresler I, 67 B.R. at 595-97; Drysdale, 785 F.2d at 41; In re Residential Resource Mortgage Investment Corp., 98 B.R. 2, 16 (Bankr.D.Ariz. 1989); In re Comark , 145 B.R. 47, 51 (B.A.P. 9th Cir. 1992). See also 5 Collier on Bankruptcy 555.02[3] (1998) (noting that "the leading decisions in the bankruptcy context have adopted the purchase and sale (or securities contract) characterization").

[32] For example, during the hearings in response to Lombard-Wall, supra note 9, the Treasury Department stated that "it is likely that the bankruptcy of [a] sufficiently large repo participant, combined with uncertainty about the status of repurchase agreements in bankruptcy agreements, could result in a 'flight to safety' by less sophisticated participants that could impair the liquidity of the market for an extended period of time." 1984 House Hearings, supra note 9, at 98 (Letter dated June 6, 1984 from Bruce E. Thompson, Jr. to Hon. Peter W. Rodino, Jr.).

Content Categories: > Legal/Regulatory